## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY MATTSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3742 |
| | § | |
| AETNA LIFE INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND OPINION

Jeffrey Mattson sued Aetna Life Insurance Company under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a)(1)(B), 1140, challenging Aetna's decision to terminate his long-term disability benefits.  Mattson and Aetna cross-moved for summary judgment.  Based on the pleadings; the motions, responses, and reply; the record; and the applicable law, this court grants Mattson's motion, denies Aetna's motion, and remands the case to the plan administrator for further proceedings consistent with this court's opinion.  The reasons for these rulings are explained below.

### I.      The Summary Judgment Record

### A.      The Policy

Mattson began working for Continental Airlines in 1985.  He has worked as a customer service agent and baggage handler.  (DE 15-2 at 2, 6).[1]  Continental obtained a disability insurance policy from Aetna.  The Aetna policy provided long-term benefits for disability, defined for the first two years as a beneficiary's inability "to perform the material duties of your own occupation because

---

[1]  Citations are to documents as numbered in Aetna's appendix to its summary-judgment motion.

of: disease or injury; and your work earnings are 80% or less of your adjusted predisability earnings." (DE 15-13 at 678 (emphasis omitted)).  After two years, the definition changed to cover only the inability "to work at any reasonable occupation solely because of: disease or injury." (*Id.*).  The policy defined "reasonable occupation" as "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 80% of your adjusted predisability earnings." (*Id.* at 690).  The policy gave Aetna "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." (DE 15-12 at 673).

**B.      The Record as to Mattson's Medical Condition and Aetna's LTD Benefits Decisions**

In 1994, Mattson developed a condition that caused involuntary head movement and turning. He was treated with frequent injections.  (DE 15-2 at 8).  The symptoms subsided over time and disappeared.  In late 2006, Mattson's condition returned.  His treating physician referred him to Dr. William G. Ondo, a board-certified neurologist and expert in movement disorders.  Dr. Ondo first examined Mattson on June 26, 2007 and diagnosed him with spasmodic torticollis, also known as cervical dysphonia.  Dr. Ondo's notes state that "[i]n November or December 2006, [Mattson's] head turning to the left recurred but less severe than in 1994, he denies limitation of head movement or head jerking. . . . He denies pain or functional impairment, but he feels embarrassed and quite concerns [sic] that his neck turn may progress and be worse like in 1994." (DE 15-9 at 561).  Dr. Ondo concluded:

> The patient has moderate left torticollis, moderate right laterocollis
> and mild retrocollis with no lateral or sagittal shift.  The frequency
> of the head turn is quite often, >75% of the time. . . .  He has pain at

2

> the back of his neck <10% of the time, and there is no disability from
> pain.   There is no disability for work, activities of daily living,
> driving, reading, watching TV or activities outside home.  He has
> slight social embarrassment. . . .  He also has neck jerking in the "no-
> no" position with a frequency of 6–7 Hz.

(*Id*. at 563).  Dr. Ondo recommended a series of injections.  (*Id*. at 564).

Around May 15, 2008, Mattson sent to Aetna an Employee Long Term Disability Plan

Benefit Application and a Work History and Education Questionnaire.  In the Application, Mattson

stated that he had been unable to work as of April 4, 2008, due to "neck twists, jerks with continual

spasms and head tremors 24/7 with pain & stiffness."  (DE 15-9 at 574).  He described his illness

as a "neurological disorder called spasmodic torticollis also called cervical dystonia."  (*Id*.).

Mattson stated that since he developed cervical dystonia, "walking in a forward motion makes my

head, neck jerk & twist uncontroleable. [sic].  While Sitting — my head shakes."  (*Id*. at 577).

Mattson listed Dr. Ondo, a neurologist, as his only treating physician.  (*Id*. at 574).

Mattson also submitted an Attending Physician Statement ("APS") and a Capabilities and

Limitations Worksheet, both dated May 23, 2008 and signed by Dr. Ondo.  On the APS, Dr. Ondo

noted that Mattson had "neck pain" and was "unable to fully move neck/head."  (*Id*. at 586).  In the

space on the APS to note "objective findings," Dr. Ondo wrote "neck rotation."  (*Id*. at 588).  Dr.

Ondo stated that Mattson had "moderate limitations of functional capacity."  (*Id*. at 587).  He

checked the box signifying that Mattson had "moderate limitation of functional capacity/capable of

light work."  (*Id*.).  Dr. Ondo also signed a letter dated May 21, 2008, stating that he was treating

Mattson for his "longstanding history of cervical dystonia" and warning that any subsequent injury

to the head, neck, and shoulder area "potentially could exacerbate this condition."  (*Id*. at 589).

3

In a letter dated June 12, 2008, Aetna asked Dr. Ondo to send Mattson's medical records. (*Id*. at 570).  On June 19, 2008, Aetna received an Initial Neurologic Evaluation dated June 26, 2007 and two forms reflecting Botox injections that Mattson had received in 2008.  (*Id*. at 558–568).  A letter dated July 11, 2008 from Dr. Ondo stated that Mattson had cervical dystonia that caused involuntary head turning; that Botox injections resulted in moderate improvement; and that Mattson had "modest disability from his condition."  (DE 15-8 at 487).

Based on the information from Mattson and Dr. Ondo, Sandra Jaramillo, an Aetna claim specialist, requested a review by an Aetna medical-claim coordinator.  (DE 15-2 at 17).  This review was performed by Pedro Cortero on July 18, 2008.  Cortero concluded that "[t]he medical data provided are insufficient to support disability in own occupation," and that there was "no clinical evidence that precludes claimant from performing his heavy pdl [physical demand level] occupation."  Cortero recommended that Aetna deny Mattson's long-term disability application. (DE 15-8 at 485).

Jaramillo disagreed with Cortero's conclusions and asked Aetna to approve Mattson for LTD benefits from June 23 through October 6, 2007, pending a vocational consult, peer review, and functional-capacity evaluation.  She found that Mattson was unable to perform his own occupation due to his "chronic condition" and "modest disability."  (DE 15-1 at 27–28).  Jaramillo noted that Mattson's occupation involved "heavy" work that required "constant or extensive amounts of lifting, loading, unloading, bending, stooping, climbing & use of a variety of equipment & assistance to the traveling public."  (*Id*. at 27).  Jaramillo's recommendation was approved on July 30, 2008, pending follow-up for "updated info and further objective information."  (*Id*. at 28).  On July 30, 2008,

Jaramillo informed Mattson and notified him that Aetna would need updated information after his September 9, 2008 office visit with Dr. Ondo.  (*Id*. at 29).

In a letter dated August 27, 2008, Aetna had advised Mattson that he should apply for Social Security disability benefits.  The letter stated that Aetna would make Allsup, a third-party company, available to Mattson to help him pursue his application.  Aetna noted that if Mattson were approved for Social Security benefits, his LTD benefits from Aetna would be reduced by an equivalent amount.  It stated, however, that there might be other benefits to Mattson to applying for SSDI.  (DE 15-9 at 517).  After receiving Aetna's letter, Mattson decided to apply for Social Security benefits and to work with Allsup during that process.

On October 7, 2008, Aetna referred Mattson to its Global Services Group for a functional-capacity evaluation ("FCE").  (DE 15-1 at 50–51).  The Global Services Group arranged for Karen Ray, a physical therapist in Houston, Texas, to conduct the evaluation.   She did so on November 4, 2008.  (DE 15-8 at 455–472).  The FCE resulted in a finding that Mattson was "functionally capable of work at a LIGHT level on an 8 hour per day basis."  (*Id*. at 456).  The FCE report concluded:

> The results of this evaluation indicate that Jeff Mattson demonstrated limited abilities in the medium category of work with an occasional waist to shoulder lift of 30 pounds.  However, in view of his inability to meet the full criteria [for] the medium category, he is functionally capable of work at a LIGHT level on an 8 hour per day basis. Increased torticollis noted with increased physical effort.  He did demonstrate appropriate physiological changes with testing.  He did not meet his job demands for lifting . . . for a customer service agent for Continental Airlines.

(*Id*.).  According to the report, Mattson demonstrated the ability to sit on a constant basis; to stand, stoop, perform reaching at desk level, and grasp on a frequent basis; and to walk, carry, climb steps,

crouch, push, pull, kneel, and perform overhead and floor-level reaching on an occasional basis. The FCE report concluded that Mattson could not perform the demands required of a customer service agent for Continental Airlines. (*Id*.)

Aetna received the FCE on November 12, 2008. After reviewing it, Jaramillo concluded that Mattson was unable to perform his own occupation and approved LTD benefits through May 31, 2009. (DE 15-3 at 109–12).

The SSA required Mattson to be examined by an independent doctor. Dr. Balakrishna Reddy Mangapuram examined Mattson on December 9, 2008. Dr. Mangapuram found "Zero medial and lateral rotation of the neck. Constant shaking of head/neck noted. Muscles of neck are stiff." (DE 15-6 at 261). Dr. Mangapuram listed his diagnostic impression as:

> Spastic Tortcollis: First episode stated in 1994 with 9 yrs of remission in between. Second episode started 1 ½ years ago. On exam today neck is bent to the right with head deviated to the left all the time with constant shaking of the head and neck. Patient had multiple Botox injections placed almost every 3 months so far without much help. Patient overall prognosis is poor . . . .

(*Id*.). In the "ability to work" section of his report, Dr. Mangapuram noted that Mattson could hear and speak normally and could usually lift, carry, and handle objects weighing less than 5 pounds. (*Id*.). A functional capacity assessment performed by Dr. Frederick Cremona on December 11, 2008, found that Mattson's external limitations permitted him to occasionally lift 20 pounds, frequently lift 10 pounds, push and pull objects normally, stand or walk with normal breaks 6 hours in an 8-hour workday and sit with normal breaks 6 hours in an 8-hour workday. (*Id*. at 265).

The SSA initially denied Mattson's benefits application. (DE 15-8 at 446). Mattson appealed. In March 2009, the SSA approved Mattson for SSDI benefits. (*Id*. at 440–443).[2]

On July 31, 2009, Aetna requested an updated APS and Capabilities and Limitations Worksheet from Dr. Ondo. Aetna asked Dr. Ondo to confirm whether Mattson was "capable of sedentary/light or medium work capacity" and whether his condition had "improved, stabilized or regressed." (*Id*. at 411). Aetna received updated forms dated August 14, 2009. Dr. Ondo noted that Mattson continued to receive Botox injections every four to six months. (*Id*. at 412). Dr. Ondo stated that Mattson had a "Long Term/Permanent Total Disability," was "restricted from work any full time or part," and that Mattson's estimated return to work date was "never." (*Id*. at 413). Dr. Ondo also wrote that Mattson had a "severe limitation of functional capacity; incapable of minimal activity." (*Id*.). The space provided to record "objective findings that substantiate impairment" was left blank. (*Id*.). On the Capabilities and Limitations Worksheet, Dr. Ondo wrote that Mattson could frequently perform activities that included forward reaching, twisting, and repetitive motions, and

_____

[2] The Social Security Act defines "disability" as:

> Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). It further states:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

that he could occasionally perform activities that included pushing, pulling, lifting, carrying, and bending.  Dr. Ondo found that Mattson could never reach above shoulder level.  He also noted that the maximum weight Mattson could lift was 11 to 20 pounds occasionally.  Mattson could, however, operate motor vehicles, hazardous machines, and power tools.  (*Id*. at 414).

Updated medical records were submitted on September 1, 2009.  These included a Toronto Western Spasmotic Torticollis Rating Scale, which rates the severity of a patient's disabilities. According to the disability scale Dr. Ondo filed out, Mattson was able to work; had no disability relating to daily living activities or other activities outside the home; and his pain did not contribute to his disability.  (*Id*. at 408).

Jaramillo sent Mattson a letter dated February 5, 2010.  The letter pointed out that as of August 2, 2010, the test for whether Mattson was "disabled" would change to whether he could perform "any reasonable occupation."  The letter explained the two definitions of disability and stated, "[w]e feel it is important that you understand your plan's definition of disability and how the change in this definition may affect your Long Term Disability (LTD) claim."  (DE 15-7 at 327). The letter also asked Mattson to provide contact information for all his treating doctors and facilities to provide an updated APS.  (*Id*. at 328).

Aetna received an updated APS from Dr. Ondo dated February 17, 2010.  In this form, Dr. Ondo stated that Mattson could perform "any job not requiring marked physical activity."  (*Id*. at 336).

On June 7, 2010, Aetna requested a review of Mattson's claim by a neurologist.  (DE 15-4 at 138).  The review was performed on June 15, 2010 by Dr. John Feibel, an independent physician who was board certified in neurology.  As part of this peer review, Dr. Feibel consulted with Dr.

Ondo.  Their conversation occurred on June 11, 2010.  Dr. Feibel wrote in his report that Dr. Ondo

"does not believe the claimant is fully disabled but would need some restrictions."  (DE 15-6 at 307).

Based on this conversation and the documents in Mattson's claim file, Dr. Feibel concluded that

Mattson's only restrictions from work were carrying items over 25 pounds on his shoulders and

frequent lifting of over 30 pounds above his head.  Dr. Feibel stated that Mattson would have no

restrictions on sitting, standing, or walking.  Dr. Feibel found that Dr. Ondo's earlier finding of "no

work" for Mattson was not appropriate because Dr. Ondo agreed that Mattson could work, with

restrictions.  (*Id*. at 307–08).

On June 22, 2010, Aetna sent a letter to Dr. Ondo asking for an updated APS.  Aetna also

asked Dr. Ondo to state whether Mattson was "released to return to work in any occupation."  (DE

15-9 at 311).  Dr. Ondo returned the form the same day and checked the "No" box to answer this

question.  (*Id.*).  On the updated APS form, Dr. Ondo stated that Mattson was "restricted from

working any full-time or part-time position," and that Mattson's estimated return to work date was

"never."  (*Id*. at 313).  The APS form asked Dr. Ondo to describe any "current restrictions and

limitations" preventing Mattson from returning to work, but Dr. Ondo did not provide any.  Nor did

Dr. Ondo provide any objective findings.

Along with the APS form, Dr. Ondo submitted a Capabilities and Limitations Worksheet.

On this document, Dr. Ondo stated that Mattson could occasionally climb, crawl, kneel, lift, push,

pull, carry, sit, stand, stoop or walk, and that he could never reach above his shoulders.  The

Worksheet stated that Mattson could operate motor vehicles, hazardous machines, and power tools.

(*Id*. at 315).

9

On July 28, 2010, a Transitional Skills Analysis was performed by Rene Wilson, M.Ed., CRC, a vocational case manager at Intracorp.  Her report noted as follows:

> Submitted record information indicates that a peer review was completed by Dr. John Feibel on 6/1512010.  The result states that the claimant would be able to perform tasks in a light capacity.  This would include lifting/carrying over 25 lbs. on the shoulders or frequently lifting of over 30 lbs. above the head.  The claimant would have no other restrictions related to sitting, standing or walking.

(DE 15-6 at 298).  Wilson also conducted a telephone interview with Mattson.  Her notes of this interview state that Mattson owned a computer and used it for "basic word, on line bill pay . . . for up to 30 minutes at a time." (*Id*. at 303).  Mattson told her he had "basic" computer skills, including "Lotus, Excel, Word, Tenkey, etc." (*Id*.).  Based on Mattson's work history and physical limitations, and the local labor market, Wilson concluded that the most appropriate jobs for Mattson were reservations agent, gate agent, surveillance system monitor, dispatcher, reservation clerk, hotel clerk, and repair-order clerk.  Of these, gate agent, dispatcher, reservations agent, and reservations clerk exceeded 80 % of Mattson's adjusted pre-disability earnings — an hourly wage of $16.22.  Three of these jobs — dispatcher, reservations agent, and reservations clerk — were considered "sedentary" positions.  Gate agent was classified as a "light" position.  Wilson found that there were positions available in these four occupations within fifty miles of Mattson's home. (*Id*. at 291–295).

Based on the information in Mattson's claims file, Aetna determined that Mattson did not meet the test for disability from "any reasonable occupation."  Aetna terminated Mattson's LTD benefits as of August 2, 2010.  Aetna explained the reasons in a letter to Mattson dated August 3, 2010.  The letter stated that Aetna had found that Mattson could engage in light physical activity and that there was an available labor market for jobs that fit his experience and activity levels with an hourly wage of $16.22 per hour or greater.  The letter explained:

The medicals indicated that Dr. Ondo felt that you could work with restrictions and limitations of any job not required to have marked physical activity on a permanent basis. The clinical review failed to support a functional impairment from any occupation.

To give your claim every consideration, we had the available medical evidence reviewed by a board certified neurologist who spoke with Dr. Ondo on June 11, 2010. The physician's report indicates that Dr. Ondo does not believe that you are fully disabled but would need some restrictions. . . . Permanent restrictions were assigned of no carrying items over 25 pounds on the shoulders or frequent lifting of over 30 pounds above the head. There were no restrictions related ti sitting, standing or walking. The restrictions were found to be appropriate by the board certified neurologist. The review failed to support a functional impairment from any occupation in the sedentary to light level of work.

(DE 15-9 at 631). The letter acknowledged that "Social Security Disability (SSD) has approved you for disability," but noted that "the SSD determination and Aetna's determination of your LTD claim are independent and one determination does not impact the other." (*Id*.). The letter told Mattson that he had a right to appeal and that Aetna would "review any additional information you care to submit, such as medical information from all physicians who have treated you for the condition(s) in question." (*Id*. at 632).

On September 2, 2010, Mattson's attorney asked for his administrative file, (DE 15-6 at 279–280), and, on January 18, 2011, notified Aetna that Mattson would appeal, (*id*. at 228–30). Mattson argued on appeal that Dr. Ondo denied telling Aetna's peer review physician, Dr. Feidel, that he did not believe Mattson was totally disabled. In support, Mattson pointed to the most recent Attending Physician's Statement Dr. Ondo completed. Mattson also argued that Aetna should have given greater weight to the fact that he was approved for Social Security disability benefits. (*Id*. at 229–30).

Aetna forwarded Mattson's medical information, including his Social Security file, to two independent medical consultants for review.  Dr. Stuart Rubin, a board-certified physician in physical medicine and rehabilitation, performed a peer review of Mattson's file on March 7, 2011. Dr. Rubin concluded that Mattson "would best be served at a sedentary work level," but found it "unclear why Dr. Ondo stated that the claimant cannot perform any work at all." (*Id*. at 207).  Dr. Rubin concluded that Mattson was capable of working as an agent, dispatcher, reservations clerk, hotel clerk, or repair-order clerk, as long as the job did not require him to move his neck or upper back.  (*Id*.).

On February 24, 2011, Dr. Leonid Topper, who is board certified in neurology, performed an additional peer review of Mattson's file.  Dr. Topper stated that he tried three times to contact Dr. Ondo, but his calls were not returned.  (*Id*. at 225).  Dr. Topper reviewed Mattson's medical records and claim file and concluded that he was capable of working at a sedentary level.  Dr. Topper found that Mattson was "able to work in any capacity which does not require carrying and lifting in excess of 10 pounds, does not require prolonged standing and walking, and does not require sustained neck posturing or repetitive flexion/extension such as required with data entry." (*Id*. at 226).

Aetna sent Mattson's counsel a letter dated February 25, 2011, stating that Dr. Topper had tried to contact Dr. Ondo without success and that Aetna was sending Dr. Topper's report to Dr. Ondo to allow him to comment.  The letter stated that no decision would be made on the appeal for a period to allow Dr. Ondo to respond, but that he would need to do so by March 7, 2011 for his comments to be considered.  (DE 15-10 at 639).  Neither he nor Dr. Ondo responded.

12

In a March 10, 2011 letter, Aetna upheld its decision to terminate Mattson's LTD benefits. Aetna found that while the record showed that Mattson had cervical dystonia and was impaired, he was capable of performing sedentary work:

> The claimant has restricted range of neck movements, neck tilt to the side, pain with neck movements, as well as significant hypertrophy of the neck muscles, primarily the sternocleidomastoid muscle, on one side. Therefore, the criteria for cervical dystonia have been met. These neurological examinations findings were documented throughout the records; primarily in the movement disorder specialist's, Dr. Ondo's notes. Considering the longstanding nature of the claimant's cervical dystonia, the reporting of physical exertion worsening his neck tilt angle and decreasing the range of cervical motion is believable, too. Based on the medical records, the claimant would only be capable of working at a sedentary work level from 08/02/10 through 02/15/11.

(*Id*. at 633). Aetna concluded that Dr. Ondo's various statements that Mattson could not perform any work were "not supported" and that Mattson was "capable of working a sedentary position from 8/2/10 through the present which does not require above-the-head or below-the-waist reach, and does not require sustained neck and hand posturing or repetitive movements." (*Id*. at 644).

The letter also noted that Aetna had considered the fact that Mattson had been approved for Social Security disability benefits:

> In addition, on 7/31/08 we approved Mr. Mattson's clam for LTD benefits and encouraged him to work with our Social Security vendor, Allsup, to apply for Social Security Disability Insurance (SSDI) benefits through the Social Security Administration (SSA). We asked your client to do this not only because his plan requires that he apply for other income benefits for which you may be eligible, but also because there are advantages if he were to be approved for SSDI benefits (e.g. Medicare eligibility, protection of retirement benefits, COLAs). . . . At that time, we had medical and vocational information which indicated that your client was totally disabled and it appeared that he would be eligible for SSDI benefits either for a closed period or an indefinite period. Since that time, we have updated his LTD claim record, as explained earlier. We then

> received additional medical records for review.  We have had these
> and other medical records reviewed by qualified medical consultants
> who have outreached to the treating physician to discuss this case.
> We have also conducted a Transferrable Skills Analysis and a Labor
> Market Analysis which revealed alternative occupations Mr. Mattson
> is capable of performing.  While your client may still be receiving
> SSDI benefits, we find that he is no longer eligible for LTD benefits,
> as he is no longer disabled based on the plan definition.

(*Id.*).

This lawsuit followed Aetna's denial of Mattson's appeal from the denial of LTD benefits.

## II.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v.*

14

*$92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B.   ERISA

An ERISA beneficiary is authorized by § 502(a) to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  *See* 29 U.S.C. § 1132(a)(1)(B).  A district court may review determinations made by employee benefit plans, including employee disability plans.  *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).  If a plan document expressly confers on the plan administrator the authority to determine benefits and construe the plan terms, as Aetna's does, the standard of review is abuse of discretion.  *See Firestone Tire & Rubber*

15

*Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In the Fifth Circuit, even if the plan does not expressly give the decisionmaker discretionary authority, "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991); *see also Vercher v. Alexander & Alexander*, 379 F.3d 222, 226 (5th Cir. 2004).

"A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotation marks and citations omitted). "'If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 468 (5th Cir. 2010) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (citations omitted).  The plan administrator's decision is arbitrary "'only if made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Holland*, 756 F.3d at 246–247 (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)).  Under the abuse of discretion standard, a court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness — even if on the low end.'" *Holland*, 576 F.3d at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 39 (5th Cir. 2007)).

## III.    Analysis

16

A.      Whether Aetna Has a Conflict of Interest

Mattson first argues that this court should give less deference to Aetna's conclusions than would normally be due because it had a conflict of interest in deciding whether to grant Mattson LTD benefits, and its actions suggest procedural unreasonableness.

In *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. (2008), the Supreme Court concluded that if an insurer also served as the plan administrator, such "a conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" *Id.* at 112 (quoting *Firestone*, 489 U.S. at 115 (internal quotations omitted)).  The existence of such a conflict does not change the standard of review "from deferential to *de novo* review," but requires "the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Glenn*, 554 U.S. at 115.  Such "conflicts are but one factor among many that a reviewing judge must take into account"; the relative weight given to a conflict of interest would vary from case to case.  *Id.* at 116.  In applying the Court's multifactor test, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.*  The Court explained:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

17

*Id.* at 117 (internal citations omitted).

Fifth Circuit cases applying *Glenn* provide guidance.  In *Holland*, 576 F.3d at 248 n. 3, the court held that *Glenn* "directly repudiated the application of any form of heightened standard of review to claims denials in which a conflict of interest is present."  *Glenn* overruled earlier Fifth Circuit cases applying a "sliding scale" under which the greater the evidence of conflict, the less deference was given.  *Id.*  Under the "sliding scale" approach, the Fifth Circuit had given "only a modicum less deference" when there was a "minimal basis for a conflict."  *Id.* (quoting *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 343 (5th Cir. 2002) (emphasis original, quotation marks removed by Holland court)).  But in *Holland,* the Fifth Circuit concluded that "much of our 'sliding scale' precedent is compatible with the Supreme Court's newly clarified 'factor' methodology, and *Glenn* does not supercede that precedent to the extent that it reflects the use of a conflict as a factor that would alter the relative weight of other factors."  *Id*.

In *Holland*, the Fifth Circuit found that to the extent a conflict of interest was present, it "is not a significant factor in this case."  *Id.* at 249.  *Holland* involved a trust set up by International Paper to provide its employees disability benefits.  The company funded the trust and a senior corporate officer served as the plan administrator.  Citing *Glenn*, the court held that a structural conflict of interest was present because "the employer who funds the plan also determines eligibility for benefits."  *Id.* at 248.  But the plan had also established structural protection against the conflict of interest by sending all claims to "independent medical professionals who have affirmed that they have no conflict of interest and that their compensation" did not depend on the outcome of their review.  *Id.*  The court also noted that there was no evidence that the conflict of interest had affected the benefits decision at issue or that there was a history of abuses of discretion.  *Id.*

18

More recently, in *Schexnayder*, 600 F.3d at 470–71, the court applied *Glenn* and found that the structural conflict of interest present in that case was "a more significant factor." In that case, Hartford served as both the plan administrator and the insurer. The court noted that "a decision to pay benefits affects Hartford's bottom-line, because benefits payments come directly from Hartford." *Id.* at 470. Following *Glenn*'s directive to consider surrounding circumstances, the court found that Hartford had not taken "any precautions to avoid or minimize this conflict," such as creating a wall between claims administrators and others or by setting up a system to penalize inaccurate benefits decisions. *Id.* The record on the benefits denial at issue showed that Hartford had ignored the Social Security Administration's determination that the claimant was "fully disabled and unable to perform any work." *Id.* at 471. These circumstances "suggest[ed] procedural unreasonableness," leading the court to "believe that Hartford's financial bias may have played a part in its decision." *Id.* at 470–71. The conflict of interest factor was given greater relative weight in the analysis. The fact that Hartford had overlooked the Social Security award was an independent factor undercutting Hartford's decision. *Id.* at 471. "Although substantial evidence supported Hartford's decision, the method by which it made the decision was unreasonable, and the conflict, because it [was] more important under the circumstances, act[ed] as a tiebreaker for [the court] to conclude that Hartford abused its discretion." *Id.* at 471.

Applying the precedents to this case makes clear that there is a conflict of interest because Aetna is both the insurer and the claims administrator. The record also leads to the conclusion that the conflict is not a significant factor. As in *Holland,* the evidence shows that Aetna repeatedly sought independent peer review by board certified specialists. Nor is there evidence that would support any inference that Aetna's system for making benefits decisions is historically problematic.

19

Finally, as explained in more detail below, Aetna sought out full information about Mattson's condition; gave his treating physician ample opportunity to respond to the findings of independent reviewers; and sought objective evaluations.  There is no indication of procedural unfairness or unreasonableness.

Unlike the defendant insurers in *Glenn* and *Schexnayder*, Aetna gave express consideration to the decision of the SSA.  Aetna had suggested that Mattson applying for Social Security disability benefits and provided him assistance in doing so.  The letter informing Mattson that Aetna had denied him continued LTD benefits acknowledged that "Social Security Disability (SSD) has approved you for disability."  (DE 15-10 at 631).  Aetna explained that it nonetheless denied Mattson continued LTD benefits because "the SSD determination and Aetna's determination of your LTD claim are independent and one determination does not impact the other."  (*Id*.).  Similarly, Aetna's letter denying Mattson's appeal stated that "we approved Mr. Mattson's clam for LTD benefits and encouraged him to work with our Social Security vendor, Allsup, to apply for Social Security Disability Insurance (SSDI) benefits through the Social Security Administration (SSA)." (DE 15-10 at 644).  In *Schexnayder*, 600 F.3d 465, the Fifth Circuit explained: "[w]e do not require Hartford to give any particular weight to the contrary findings; indeed, Hartford could have simply acknowledged the award and concluded that, based on the medical evidence before it, the evidence supporting denial was more credible."  *Id. at* 471.  Aetna has shown that it considered the SSA's decision to award Mattson benefits.

The precedents do not support Mattson's argument that a standard other than abuse of discretion should apply.

**B.      The Evidence as to the Extent and Effect of Mattson's Disability**

Mattson argues that Aetna abused its discretion in concluding that he was not disabled and that the manner in which Aetna rejected Dr. Ondo's finding that he was not capable of any work shows that its decision was procedurally unreasonable. The record, however, shows that Dr. Ondo's findings were inconsistent and often conclusory. Based on the record, Aetna did not act arbitrarily in discounting those findings.

In his 2008 APS, Dr. Ondo stated that Mattson had "moderate limitations of functional capacity." (DE 15-9 at 587). In a letter to Aetna the same year, Dr. Ondo found that Mattson had "modest disability from his condition." (DE 15-8 at 487). In the 2009 APS, Dr. Ondo stated that Mattson was "restricted from work any full time or part," but he did not explain why Mattson was unable to do sedentary or light work. Dr. Ondo noted in the 2009 APS that Mattson could lift weights of 11 to 20 pounds occasionally and that he could operate motor vehicles, hazardous machines, and power tools. (*Id*. at 414). Dr. Ondo stated on the disability scale that he submitted with the 2009 APS that Mattson was able to work and had no disability relating to daily living activities or other activities outside the home. (*Id*. at 408). In 2010, Dr. Feibel consulted with Dr. Ondo as part of his peer review and noted on his report that Dr. Ondo told him that Mattson could work, with some restrictions. (DE 15-6 at 307–08). On the 2010 APS, Dr. Ondo again stated without explanation that Mattson was "restricted from working any full-time or part-time position," but that he could operate motor vehicles, hazardous machines, and power tools. (DE 15-7 at 313).

Aetna gave Mattson and Dr. Ondo several opportunities to resolve these inconsistencies. Dr. Ondo did not respond to Dr. Topper's repeated requests for a telephone consultation about Mattson. Aetna sent Dr. Topper's report to Dr. Ondo and suspended the appeals process to give an additional opportunity to comment. (DE 15-10 at 639). Aetna informed Mattson that it had suspended the

21

appeals process and was attempting to contact Dr. Ondo.  Neither Mattson nor Dr. Ondo responded.

Mattson also argues that Aetna acted deceptively by suggesting in its denial letter that Dr. Ondo had released him to return to work.  (DE No. 17 at 18).  The denial letter suggests that this conclusion was based on Dr. Feibel's statement in his peer review that Dr. Ondo had told him in their telephone conversation that Mattson could work, with limitations.  But there is no evidence in the record that Dr. Feibel incorrectly recorded Dr. Ondo comments to him.   Given the inconsistencies in Dr. Ondo's findings and the absence of any evidence that Dr. Feibel's report was inaccurate, this court cannot conclude that Aetna abused its discretion in finding that Dr. Ondo had stated that Mattson was able to work with restrictions.

Other evidence in the record also supports Aetna's conclusion that Mattson was not completely disabled, as defined in the Aetna policy.  The 2008 Functional Capacity Evaluation conducted by Ray found that Mattson was functionally capable of work at a "LIGHT level on an 8 hour per day basis."  (DE 15-8 at 456).   In 2010, Dr. Feibel concluded that Mattson's only restrictions from work were carrying items over 25 pounds on his shoulders and frequent lifting of over 30 pounds above his head.  In reviewing the claims record in early 2011, Dr. Rubin and Dr. Topper both found that Mattson was capable of sedentary work.  Dr. Rubin noted that "[i]t is unclear why Dr. Ondo stated that the claimant cannot perform any work at all."  (DE 15-6 at 207).

Mattson contends that Aetna abused its discretion in failing to advise Wilson, who performed the transferable skills and labor market analysis, that Dr. Ondo had recently stated that Mattson had no ability to work.  (DE 17 at 15).  Aetna did provide Wilson with Dr. Feibel's findings.  As Mattson points out, the medical reviews performed by Dr. Rubin and Dr. Topper, after Wilson's work had ended and the appeal was underway, suggested that his restrictions were more

22

severe than Aetna relayed to Wilson before she did her analysis.  Both Dr. Rubin and Dr. Topper found that Mattson was capable of performing sedentary work; Wilson was told that Mattson was able to perform light work.  Dr. Rubin stated that Mattson was capable of working as an agent, dispatcher, reservations clerk, hotel clerk, or repair-order clerk, as long as these jobs did not require moving the neck or upper back.  (DE 15-6 at 207).  Dr. Topper found that additional restrictions were necessary.  He stated that Mattson was "able to work in any capacity which does not require carrying and lifting in excess of 10 pounds, does not require prolonged standing and walking, and does not require sustained neck posturing or repetitive flexion/extension such as required with data entry."  (*Id*. at 226).[3]

The reviews performed by Dr. Rubin and Dr. Topper during the appeal apparently caused Aetna to modify its conclusions about what types of jobs Mattson could perform.  In its initial denial letter, Aetna concluded that Mattson was capable of performing light work.  In its appeal letter, however, Aetna stated that "[i]t is our determination that your client is capable of working a sedentary position . . . that does not require sustained neck and hand posturing or repetitive movement."  (DE 15-10 at 644).  Yet Aetna continued to rely on the skills and labor market analysis that Wilson performed based on the assumption that Mattson could perform light work with no restrictions on the repetitive movement that would be required with data entry.  Three of the four jobs that Wilson identified as appropriate for Mattson — dispatcher, reservations agent, and reservations clerk — were considered sedentary jobs.  Wilson did not state in her report whether those positions would satisfy the additional limitations that Aetna found were supported by the

---

[3]  Mattson may overstate the point when he contends that Dr. Rubin and Dr. Topper found he could only perform a sedentary occupation that did not require doing paperwork or using a computer.  (DE No. 17 at 16).

medical evidence.  The record does not contain any other evidence about whether the dispatcher, reservations agent, and reservations clerk positions would require sustained neck and hand posturing or repetitive movement or whether there are other sedentary jobs, not mentioned in Wilson's report, that might be suitable for him.

In its appeal denial letter, Aetna also suggests that Mattson could be employed as a "phone switchboard operator or similar position."  That position was not discussed in Wilson's analysis. The fact that Aetna included it in the appeal letter is apparently based on a recommendation made by Dr. Topper in his peer review.  There is no evidence, however, about whether a job as a phone-switchboard operator would permit Mattson to earn "an income of more than 80% of [his] adjusted predisability earnings," as the plan required.

The record shows that Aetna's conclusion that there were "reasonable occupations" that Mattson could perform was not based on substantial evidence.  As a result, Mattson's summary judgment motion is granted and Aetna's is denied.

### C.    Appropriate Relief

Aetna argues that even if this court grants Mattson's summary-judgment motion, the appropriate form of relief is to remand this case to the plan administrator.  (Docket Entry No. 13 at 24 n. 117).  "Remand to the plan administrator for full and fair review is usually the appropriate remedy when the administrator fails to substantially comply with the procedural requirements of ERISA."  *Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009).  An exception to the remand rule applies when "'the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law."  *Id.* at 158 (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008)); *see also Caldwell v. Life Ins.*

*Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) ("A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious."). "If an administrator has made a decision denying benefits when the record does not support such a denial, the court may, upon finding an abuse of discretion on the part of the administrator, award the amount due on the claim and attorneys' fees." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999) (en banc), abrogated on other grounds by *Glenn*, 554 U.S. 105.

In this case, Aetna abused its discretion in denying Mattson's application for benefits. The appropriate remedy is to grant the summary judgment motion and award Mattson benefits.

## IV.    Conclusion

For the reasons stated above, Mattson's motion for summary judgment is granted and Aetna's motion for summary judgment is denied. Mattson is awarded long-term disability benefits under the Aetna policy.

SIGNED on February 28, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25